**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE FERGUSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 C 4084 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, | ) | |
| a municipal corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

George Ferguson, an employee on medical leave of absence from the City of Chicago's ("City) Department of Fleet and Facility Management ("2FM"), brings this suit alleging failure to accommodate, discrimination, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq*. Ferguson alleges that the City failed to accommodate, discriminated against, and retaliated against him in his Watchman position because of his muscular dystrophy. The City asks for summary judgment all Ferguson's claims. Because material issues of fact exist as to whether Ferguson was a qualified individual with a disability and whether his request for a lower profile vehicle was an undue burden on the City, the City's motion [80] is denied with respect to Ferguson's failure to accommodate claim. The motion is granted as to any duty to reassign claim as well as Ferguson's discrimination and retaliation claims.

# BACKGROUND[1]

Ferguson has had muscular dystrophy since birth. He began using one cane in approximately 1998 when he was about forty years old and two canes in about 2008 when he was about fifty years old. The City hired Ferguson to be a Watchman in June 1994. Watchmen "protect and maintain security and safety in and around City buildings and surrounding grounds." Parties' Joint Statement of Undisputed Material Facts ("Stmt.") ¶ 6 (alterations omitted). Ferguson reported to Anthony Renda, Supervisor of Watchmen for 2FM. In 2012, Renda reported to Glen Cross, the Director of Security for 2FM. Kevin Murphy is the Labor Relations Supervisor for 2FM. Ferguson arrived for work on time when he was working full time for the City. He drove himself to and from work.

A minimum qualification for the Watchman position is the physical ability to patrol assigned areas, which may be on foot or in a vehicle. Since at least 2012, there have been three Watchman shifts at each City premises. One Watchman per shift is assigned to a particular location, but there are not enough Watchmen to cover every premise every shift. Watchmen are assigned based on the vulnerability of certain City premises, which can vary depending on the day and has also changed over time. If one or more Watchmen are not available, then the available Watchmen are assigned to the most vulnerable locations, leaving other locations unattended. If a Watchman cannot perform his patrol duties, 2FM would have to assign another Watchman or hire someone else to perform those duties. Also since at least 2012, Watchmen have been rotated to different City premises so that they did not become complacent in performing their duties.

---

[1] The facts in this section are derived from the Parties' Joint Statement of Undisputed Material Facts [81] and Ferguson's filing of supplemental exhibits to the Statement [85, 86]. They are taken in the light most favorable to Ferguson, the non-movant.

Ferguson worked Saturdays through Wednesdays on the first shift (7:00 a.m. to 3:00 p.m.) at multiple locations. His job duties differed depending on the location. Ferguson worked at the 30th and Sacramento location approximately once a week. There he would sit in an unmarked squad car, checking individuals coming in and out of the premises. Ferguson worked at the 900 East 103rd Street location two days a week. There he sat in a booth with two concrete steps and watched the parking lot and door to the building. Ferguson testified that he was not required to do a foot patrol at this location. Cross testified that one of the duties of this location was a foot patrol of the parking lot every hour.

Cross testified that he saw Ferguson walk with a limp and knew "that there's something wrong," but when he saw Ferguson do his job, he was able to do it. *Id.* ¶ 90 (alterations omitted). Similarly, Renda testified that Ferguson had some difficulty walking and did his patrols slowly, but "[he] was doing it" and stated that Ferguson "did his job more or less." *Id.* ¶ 88.

In the beginning of 2012, Ferguson began working at the 52nd and Oakley (also known as 52nd and Western) location on Saturdays and Sundays. There, because of the size of the premises and gang activity, Ferguson was required to patrol in a City vehicle every thirty minutes. Ferguson did not have to exit the car during the patrols. Ferguson had not had to patrol in a car before being assigned to 52nd and Oakley in 2012.

When required to patrol a premises by car, Watchmen use a vehicle provided to 2FM's Security Operations Division by the Fleet Division. When a 2FM Security Division vehicle needs repair, the Security Division receives a loaner vehicle from the Fleet's in-stock vehicles. Cross requests SUVs, such as Ford Escapes, for the loaner vehicles, but sometimes receives cargo or carpenter vans. Cross is responsible for assigning vehicles to the locations and he

assigns vehicles with Mars Lights (flashing lights on the top of the vehicle) to the 52nd and Oakley location because the lights act as an additional theft deterrent in this vulnerable location.

When Ferguson began at 52nd and Oakley, the City vehicle assigned there was first a mini-van, then a Ford Escape. The only time a different vehicle was assigned to that location was when the assigned vehicle was "down." *Id.* ¶ 13. Ferguson liked the mini-van and Ford Escape because the cars were low and he could easily enter and exit those vehicles.

Around February or March 2012, a carpenter van was also available at the 52nd and Oakley premises and Ferguson complained verbally to Eliga Jubiter, a Supervisor of Watchmen, that the mini-van and Ford Escape were "more comfortable" and made him "more able to do his job." *Id.* ¶ 14 (alterations omitted). Jubiter permitted Ferguson to use the Ford Escape that day.

During the summer of 2012, Ferguson had to use the carpenter van to patrol the 52nd and Oakley premises. He used the van almost every weekend from August 2012 through September 23, 2012. In August 2012, Ferguson complained verbally to Renda, and Thomasina Clay and Vidalia Mamie, Watchmen who serve as weekend Foremen, about using the carpenter van. Ferguson was told that it was the only vehicle available because the others were in the shop. Ferguson made no written requests for another type of vehicle and did not tell anyone else at the City that he needed a certain type of vehicle.

During this time, Ferguson used a tree stump, approximately two feet wide and one foot high, that he found on the premises to climb into the carpenter van. Ferguson believes that this tree stump was sitting out because the Department of Forestry worked at that location. Renda asked Ferguson if he could use the stump to get into the van and Ferguson said yes.

Renda states that Ferguson never made any request to him for a block to help him get into the vans or a particular type of vehicle to do his job. Renda states that Ferguson never

complained to him about being assigned a smaller or certain type of vehicle and that he was unaware of a need by Ferguson for an accommodation. Cross rode with Ferguson on his patrol sometime in 2012 and, according to Ferguson, told Ferguson that he drove well. Cross denies that Ferguson ever asked for an accommodation. Ferguson states that he made three verbal requests for a lower vehicle: (1) to Renda in the summer of 2012, (2) to Renda on September 23, 2012, and (3) to "Eli." *Id.* ¶ 95. Ferguson also states that he complained to Renda and Clay when the Ford Escape was not available and that the vans were too high.

On September 23, 2012, Ferguson was told that the Ford Escape was in the shop and the carpenter van was the only vehicle available. Ferguson looked for the tree stump, but could not find it, and reported that to Renda. Ferguson attempted to enter the carpenter van without the stump and slipped and fell.[2] Ferguson believes that it was wet that day and further believes that he fell because there was no tree stump.

Ferguson was not able to get up from the fall unassisted. He called Renda at the office. Renda sent Clay to assist Ferguson, but she did not arrive for about thirty minutes. Ferguson was sitting up, with his back to the vehicle, when Clay arrived. Ferguson believes that Clay was driving the vehicle that should have been assigned to him. Clay attempted to assist Ferguson off the ground by grabbing his belt and pulling up. Clay is approximately four feet eleven inches tall and approximately 100 pounds. Ferguson is five feet seven inches tall and at that time weighed approximately 180 pounds. Clay described helping Ferguson up as "a problem" and told Renda that if Ferguson were to fall again, she would not be able to help him. Ferguson was not injured in the fall; no police report was made and no hospital visit was required. Renda believes that an internal incident report was filed.

---

[2] Ferguson had fallen at work on five separate occasions between 1997 and 2008. In four of those falls, Ferguson was injured and sought medical treatment. He was able to get up from the ground without assistance after each of the five falls.

Renda reported the September 23, 2012 incident to Cross. Cross testified that he was told by Renda that Ferguson was "having complications with walking and fell and couldn't get up" and that Ferguson told him that he had fallen and needed assistance getting up. *Id.* ¶ 23 (alterations omitted). Cross told Ferguson that the incident "was a concern because we have to use a vehicle to drive, and if you can't drive or walk, then we have to look at your situation." *Id.* (alterations omitted). Cross reported the incident to Murphy, expressing concerns about Ferguson's ability to perform his work safely. Murphy recommended that Ferguson be sent for a fitness for duty ("FFD") examination. Murphy testified that there were concerns about Ferguson's safety if he were to fall in a work site parking lot and not be able to get up and concerns that Ferguson was not able to perform his job duties in a safe manner.

On October 2, 2012, Cross instructed Renda to take Ferguson for a FFD examination. Dr. Lynsey Schlotzer, a doctor for U.S. HealthWorks, conducted the FFD on Ferguson. She was aware of the City's concern that Ferguson could not rise unassisted off the ground after a fall. Ferguson was asked to squat, rise from a chair without arm supports, and to walk around the room without his canes. Ferguson told Dr. Schlotzer that he could not perform any of those acts. Dr. Schlotzer determined that Ferguson was "not fit for duty" because he could not rise from a prone or supine position, perform a squat, ambulate unassisted, or drive. She determined that he had significant weakness and muscular wasting in his upper and lower extremities, including his feet. She submitted a report that Murphy reviewed.

Ferguson states that when Dr. Schlotzer told him that he was not fit for duty, he "cried like a baby." *Id.* ¶ 106.

Murphy instructed Cross to take Ferguson off duty. Ferguson continued to report and swipe into work, per his union's instructions. Ferguson testified that around October 12 or

October 13, 2012, Renda told him that he was being "dismissed" from his job under instructions from Cross and that he should report to Murphy. Ferguson did not speak with Cross. Murphy met with Ferguson to discuss the FFD examination and next steps. Murphy told Ferguson that he could either take Family Medical Leave Act ("FMLA") leave or would be considered absent without leave. Murphy took Ferguson's city identification. Ferguson was granted a medical leave of absence after he was found unfit for duty. Ferguson applied for and was granted FMLA leave for the periods November 1, 2012 through December 31, 2012, January 1, 2013 through March 25, 2013, and March 26, 2013 through June 25, 2013.

In November 2012, Ferguson submitted to the City a note from Dr. Solomon Liburd, a chiropractor and physical therapist, stating that Ferguson "will be able to return to work" at an unspecified date and that he was "able to drive a vehicle." *Id.* ¶ 32. Dr. Liburd was not treating Ferguson's muscular dystrophy; rather he was providing palliative care for leg pain. Dr. Liburd did not see a job description of the Watchman position or speak with a City employee about Ferguson. Dr. Liburd did not know what Ferguson's job duties were beyond driving. Dr. Liburd did not perform an FFD examination. Dr. Liburd did not observe Ferguson operating a vehicle and did not ask him if he had difficulty driving due to weakness in his lower extremities. Dr. Liburd based his statement that Ferguson could drive on what Ferguson had told him. Murphy responded to that note by informing Ferguson that based on the FFD medical findings, 2FM could not return him to duty until he provided additional documentation regarding his medical condition.

Around February 8, 2013, Ferguson submitted a Reasonable Accommodation Request Form with a note from Dr. Liburd stating that Ferguson was "able to return to work" and "able to operate a motor vehicle." *Id.* ¶ 36. On February 26, 2013, Murphy responded that the note did

not contain sufficient information for 2FM to determine Ferguson's fitness for duty and requested "medical documentation from a licensed physician (M.D. or D.O.) showing that you are currently fit for duty based on the scope of your position." *Id.* ¶ 38. Murphy provided Ferguson another Accommodation Request Form, an Accommodation Request Medical Questionnaire, and the job specification for the Watchman position.

By letters of February 26, 2013 and April 4, 2013, Murphy offered Ferguson the opportunity to undergo another FFD examination at the City's expense. There is no record that Ferguson did so.

About April 26, 2013, Ferguson submitted another Reasonable Accommodation Request Form (dated March 12, 2013) with a medical questionnaire completed by Dr. Akhtar Parvaiz, an internal medicine and cardiology physician, who began treating Ferguson in March 2013. Ferguson's Reasonable Request Form requested a low vehicle that he could enter and exit, low stairs that he could manage, and guardrails. Ferguson did not identify his physical limitations or explain why he needed these specific accommodations. In the medical questionnaire, Dr. Parvaiz marked that Ferguson is unable to climb stairs or perform repetitive use of foot controls, "anything [he] has to do consistently," which can technically include the pedals on a car. *Id.* ¶ 42. Dr. Parvaiz indicated that Ferguson cannot stand for more than ten minutes and that he is restricted in his walking, i.e. "he can walk with difficulty only half a block." *Id.* Dr. Parvaiz indicated that Ferguson did not have a work restriction with respect to driving. Dr. Parvaiz made this determination based on Ferguson's representation that he drives to work regularly without problem. Dr. Parvaiz did not observe Ferguson driving or getting in and out of a car and did not take into account whether Ferguson had difficulty with those actions. Dr. Parvaiz testified at his deposition that his determination in that questionnaire was not an opinion one way or the other

that Ferguson was physically capable of working at that time. Dr. Parvaiz's knowledge of Ferguson's job is entirely from Ferguson, who told him that he mostly watches monitors and patrols around the perimeter of buildings.

Dr. Parvaiz also signed a note dated April 27, 2013 that stated that Ferguson had not recovered enough to return to work. That determination was based on Ferguson's representations to Dr. Parvaiz and a physical exam.

Approximately May 31, 2013, Ferguson claims to have submitted another Reasonable Accommodation Request Form. However, Murphy did not receive that form and Ferguson has no independent memory of sending it. That Form also requested a low vehicle, low stairs, and to not be required to walk long distances. On June 13, 2013, Ferguson submitted a note from Dr. Liburd stating that Ferguson was "able to return to work" and "able to operate a motor vehicle." *Id.* ¶ 47.

Around June 15, 2013, Ferguson submitted a note from Dr. Parvaiz that stated Ferguson was "being released to full duty" after being in Parvaiz's care since March 12, 2013, during which period Ferguson was "totally disabled and unable to work." *Id.* Dr. Parvaiz clarified at his deposition that by "released to full duty" he meant that Ferguson could resume his Watchman duties, which Parvaiz understood as "mostly sitting down" and that by "totally disabled," Dr. Parvaiz meant he wasn't able to do his Watchman job. *Id.* Dr. Parvaiz testified that he did not mean that Ferguson did not need an accommodation to perform the Watchman job.

On June 22, 2013, Dr. Parvaiz drafted a second note, also stating that Ferguson was "being released to full duty," but describing Ferguson's prior condition as "disabled and unable to work," not "totally disabled." *Id.* ¶ 48.

In June or July 2013, Murphy spoke with Ferguson. He told him that a position was available and that he just needed to be fingerprinted to be integrated back into the City's system. Murphy also asked him whether, in light of Dr. Parvaiz's opinion that he was fit for duty, Ferguson wanted to proceed with the accommodation request. Ferguson stated that he only wanted a certain vehicle.

Around June 2013, Jennifer Smith, the City's Disability Officer who was in charge of evaluating accommodation requests, called Dr. Parvaiz because she was uncertain of Ferguson's limitations and needed clarifications on Parvaiz's recommended accommodations. Smith told Dr. Parvaiz of Ferguson's job duties so he could make specific recommendations for those duties. Smith sent Ferguson a letter on July 9, 2013 requesting this additional information and asking him to give the letter to his health care provider. Ferguson spoke with Smith about the request and provided Dr. Parvaiz with the letter. Dr. Parvaiz did not have any specific suggestions for accommodations. Smith wondered if a motorized scooter would assist Ferguson in his patrol duties. Cross testified that scooters are not considered feasible for patrol due to rough terrain and inclement weather. Smith did not interview Ferguson. She was not aware that Ferguson had been using the tree stump to enter the carpenter van and did not visit Ferguson's work sites.

Around September 7, 2013, Ferguson submitted another Reasonable Accommodation Request Form that attached a medical questionnaire from Dr. Parvaiz stating that Ferguson has weakness in his lower extremities and is permanently limited in multiple activities, including repetitive use of foot controls, standing, walking, climbing stairs, and getting up after a fall. Dr. Parvaiz stated that Ferguson could only spend five percent of his work hours standing, one to two percent walking, and five to ten percent operating a motor vehicle. Dr. Parvaiz

recommended "a sitting job, that he has been able to do since his employment," as an accommodation. *Id.* ¶ 56.

The City issued a Determination Notice ("Notice") informing Ferguson that his request for an accommodation was denied "because your doctor has indicated that you need a sitting down job because you are very limited in standing/walking/operating a motor vehicle/squatting/getting up after a fall/climbing ladders and stairs." *Id.* ¶ 59. Ferguson signed that Notice on October 9, 2013. Smith determined that no effective accommodation existed that would allow Ferguson to perform the essential functions of his job as a Watchman without undue hardship to the City or causing a direct threat to the safety of him or others. She therefore referred Ferguson to reassignment by the City's Department of Human Resources ("DHR"). Per the reassignment process, DHR conducted a 92-day reassignment search for Ferguson from approximately November 8, 2013 to February 8, 2014. During the reassignment process, the City searches for vacant positions the equivalent or lower rating of the employee's current position. Ferguson informed DHR that he would not consider a lower paying position or a position where he would lose his seniority. Two positions opened up during the reassignment period, but Ferguson either did not meet the minimum qualifications for or was not physically capable of performing the job duties for those positions. Five vacancies for the position of Watchman were available as of April 2014. Ferguson is on medical leave of absence and can remain on medical leave of absence indefinitely if he wishes.[3]

Ferguson's medical condition has deteriorated since the end of 2012. When he was working full time as a Watchman, he could climb the ten stairs on his front porch every day, plus twice weekly to attend church. He now uses a wheelchair to go longer distances, does not

_____

[3] Although the Parties' Joint Statement of Undisputed Material Facts states that Ferguson is on medical leave, in responding to the motion for summary judgment, Ferguson asserts that he was discharged.

ascend stairs on his own, and continues to fall and cannot rise without assistance. His cousin reports that Ferguson has trouble driving and his son states that his father has not driven since going on medical leave. Ferguson claimed at his deposition that he does not need assistance driving. Ferguson does not leave his home by himself. He has difficulty walking short distances. He has gained weight. Ferguson attributes his decline to not being active by going to work.

Ferguson filed a Charge with the Equal Employment Opportunity Commission ("EEOC") around October 16, 2012, and on March 8, 2013, the EEOC issued a right to sue letter. Ferguson filed his Complaint in this Court on May 31, 2013, alleging discrimination, retaliation, and the denial of a reasonable accommodation, in violation of the ADA.[4] Ferguson states that Murphy, Cross, Clay, and Mamie discriminated against him. Ferguson admits that Murphy and Cross never made any derogatory statements about his medical condition. Ferguson believes that Cross and Murphy made the determination that he was not fit for duty because they are in management and that Murphy discriminated against him by firing him. Ferguson believes that Mamie discriminated against him by making derogatory comments to him and telling him he should quit and that Clay told other employees that Ferguson should quit. He states that Clay and Mamie would not provide him the Ford Escape in order to harass him and that they were the only ones responsible for his not being able to use the Ford Escape. Ferguson alleges that only Murphy, Mamie, and Clay retaliated against him.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and

---

[4] Ferguson had pleaded a hostile work environment claim, but voluntarily dismissed it on July 18, 2013.

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.      Whether Ferguson is a Qualified Individual With a Disability

The City seeks summary judgment on Ferguson's discrimination and reasonable accommodation claims on the basis that he has not met his preliminary burden of showing that he is a qualified individual with a disability. Ferguson responds that whether he is a qualified individual is a factual dispute for the jury.[5] Because Ferguson has offered evidence that creates a genuine issue of material fact as to whether he was a qualified individual at the time the City placed him on medical leave and when it denied his reasonable accommodation request, and whether his requested accommodation of a lower vehicle is an undue burden, the Court denies

---

[5] The Court notes that Ferguson's attorney filed two separate responses to the City's motion for summary judgment, in contravention of the local rules authorizing the opposing party to file "*a* supporting memorandum of law." N.D. Ill. L.R. 56.1(b) (emphasis added). However, in the interest of justice, the Court has fully considered Ferguson's arguments in both briefs.

summary judgment on this basis.  To the extent Ferguson is bringing a failure to reassign claim, however, the Court grants the City summary judgment on that claim.

"The ADA prohibits discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, and other terms, conditions, and privileges of employment."  *Basith v. Cook County*, 241 F.3d 919, 926–27 (7th Cir. 2001) (alterations omitted) (quoting 42 U.S.C. § 12112(a)) (internal quotation marks omitted).  The ADA also prohibits the refusal to make reasonable accommodations to known mental or physical limitations of an otherwise qualified individual with a disability.  *Id.* at 927.  For his reasonable accommodation claim, Ferguson must show that: "1) he was disabled; 2) his employer was aware of his disability; and 3) he was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position."  *Id.* Ferguson bears the burden of proof to show that he is a qualified individual under the ADA. *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998).

The City argues first that Ferguson is not a qualified individual because he cannot perform the essential functions of the job of Watchman with a reasonable accommodation. When determining the essential functions of a position, the Court may consider, among other things, "evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs."  *Basith*, 241 F.3d at 927 (citing 29 C.F.R. § 1630.2(n)(3)).  According to the 2007 job description, the position of Watchman requires the "physical ability to patrol assigned areas."  Stmt. ¶ 6 (alterations omitted).  Ferguson's description of his duties at the various City premises included foot and car

14

patrols and Cross testified that foot and car patrols were required at certain locations. There is no factual dispute that patrolling is an essential element of the Watchman position. That Ferguson did not have to execute foot or car patrols at every site he worked does not mean that patrolling is not an essential function of the job. "[A]n essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential. Rather, an essential function must be a fundamental duty of the job." *Basith*, 241 F.3d at 929 (citation omitted) (finding task of delivery that took 45 minutes to an hour in an eight hour day was essential). The job description makes clear that patrolling is vital to the Watchmen's function of securing the City's property and buildings.

Whether an individual is a "qualified individual with a disability" is determined as of the date of the employment decision. *Nowak*, 142 F.3d at 1003. Therefore, the Court will analyze whether Ferguson was a qualified individual as of October 2012, when the City placed him on medical leave, and October 2013, when the City denied his request for accommodation.

### A. October 2012 Medical Leave of Absence

The City argues that the undisputed evidence demonstrates that Ferguson was limited in his ability to walk, climb, rise unassisted from a fall, and drive in October 2012 when the City placed him on medical leave and therefore he was not a qualified individual at that time. Ferguson counters that he has presented evidence that he was able to return to work immediately after the incident. Because there is a fact dispute as to whether Ferguson was qualified to perform the essential functions of his job in October 2012, summary judgment on this claim is denied.

The record shows that during the September 23, 2012 incident, Ferguson could not rise unassisted after his fall. The doctor who conducted Ferguson's FFD exam in October 2012

determined that he was unable to rise from a prone or supine position, squat, ambulate unassisted, or drive due to significant weakness and muscular wasting in his lower extremities, including his feet.

Ferguson asserts that was a qualified individual in October 2012 able to perform the essential functions of the job and in support presents his own testimony that he had been performing the job prior to his fall. A district court cannot discredit a plaintiff's testimony on summary judgment, even if it is of a "self-serving" nature. *See Hill v. Tangherlini*, 724 F.3d 965, 967–68 (7th Cir. 2013) (finding it was error for the district court to discount the plaintiff's testimony, because "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving"). Ferguson also relies on the testimony of Renda and Cross, both of whom stated that Ferguson could do his job when he was working full-time.

Ferguson also presents evidence from his chiropractor attesting that at or about October 2012, he was fit to return to duty. In November 2012, his chiropractor Dr. Liburd, who did not treat Ferguson's muscular dystrophy but rather gave palliative pain care, stated that Ferguson was able to return to work and could drive a car. Dr. Liburd based this assessment on what Ferguson told him. Ferguson submitted a similar note from Dr. Liburd in February 2013.[6]

In response to the City's motion for summary judgment, Ferguson attaches a report by Thomas A. Grzesik, a rehabilitation counselor, who, in reliance on an interview with Ferguson in 2014 and a review of doctors' notes, opines that Ferguson was able to perform all the essential functions of the Watchman job when he was a Watchman and needed an accommodation to use a

_____

[6] Ferguson also presents evidence from Dr. Parvaiz, an internist and cardiologist who began treating his muscular dystrophy in March 2013. The Parvaiz evidence is directed at Ferguson's condition in March 2013 and after and is not relevant for the October 2012 analysis.

certain vehicle two days out of the week.  Doc. 86, Ex. 17.  Grzesik's states that Ferguson was

able to perform all his job functions during his nineteen years as a Watchman, which would

include September and October 2012.  While the Court need not credit an expert's "naked

conclusion unsupported by any factual foundation," *see Weigel v. Target Stores*, 122 F.3d 461,

468–69 (7th Cir. 1997) (affirming district court's rejection of expert testimony at summary

judgment), Grzesik's opinion is based on Ferguson's medical history and the City has not

presented a *Daubert* challenge or given the Court any good reason to exclude it.[7]

Ferguson has therefore presented some medical and expert evidence, in addition to his

own testimony, that he was able to perform the essential functions of his job when he was placed

on medical leave.  The City asks the Court to credit the FFD exam report created by a medical

doctor over Ferguson's own testimony and the chiropractor's opinion, arguing that the

chiropractor offered palliative pain care, did not treat Ferguson's muscular dystrophy, and further

based his opinion on Ferguson's self-reporting.  However, these kinds of competing fact and

credibility determinations are inappropriate on summary judgment.  *See Kauffman v. Petersen*

*Health Care VII, LLC*, 769 F.3d 958, 962 (7th Cir. 2013) (overturning grant of summary

judgment for employer because the district "judge was attempting to resolve a genuine factual

dispute without a trial"); *Paz v. Wauconda Heathcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664

(7th Cir. 2006) (reminding district courts to view "the evidence in the light most favorable to the

plaintiff" and avoid "mak[ing] credibility determinations, weigh[ing] the evidence, or decid[ing]

which inferences to draw from the facts").  Ferguson's evidence that he was a qualified

individual in October 2012 is limited, but is just enough to allow him to survive summary

---

[7] The City asks the Court to disregard Grzesik's report because it contains "inadmissible hearsay and legal
opinions."  Doc. 87 at 1 n.1.  Under Rule 703, an expert may rely on otherwise inadmissible evidence if it
is of the kind that experts in that particular field generally use.  Fed. R. Evid. 703.  Because the City has
not presented a substantive challenge to Grzesik, the Court notes this evidence without making any
finding on Grzesik's qualifications or his evidence's reliability or relevance.

judgment. *See Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 293–94 (7th Cir. 2014) (finding plaintiff unqualified, but noting that this ruling did not "erect[] an unreasonable hurdle for ADA plaintiffs," noting the plaintiff "could have sought additional expert medical or vocational evaluation of his capabilities with or without accommodation"). Summary judgment on the issue of whether Ferguson was a qualified individual in October 2012 is denied.

### B. October 2013 Reasonable Accommodation Denial

#### 1. Requested Accommodation

The City argues that there is no reasonable accommodation that would allow Ferguson to perform the job of Watchman safely. The City further claims that Ferguson would present a direct threat to his own or other's safety in that position; therefore, he is not qualified. Ferguson responds that he can do the job with a reasonable accommodation and is not a safety threat. Because there is a question of fact as to whether Ferguson was a qualified individual in October 2013 and whether his requested accommodation was an undue burden, summary judgment on this issue is denied.

The City argues that Ferguson is a safety threat to himself and others because he cannot rise unassisted from a fall, has permanent restrictions in his ability to drive, and has had numerous accidents. *See Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 661–63 (7th Cir. 2005) (affirming district court's finding that employee with uncontrolled diabetes was a direct threat that rendered him unqualified, explaining, "[t]his court has recognized that where the plaintiff's medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, injury may be considered likely to occur"). In making this argument, the City relies on the record and Dr. Parvaiz's testimony—the same evidence that Ferguson uses to argue that he is not a threat and, with the proper accommodation, would be qualified. The FFD examination report

did not describe Ferguson's muscular dystrophy as creating a threat to himself or others. The City does not present any medical testimony to this effect beyond the FFD examination report's determination that Ferguson was unable to drive. The City also points to the testimony of Ferguson's son and cousin that he has not driven safely since October 2012. Ferguson, however, attested that he has and continues to drive. While there is no requirement under the ADA that an employer continue to employ an individual likely to cause injury to another, *see Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129–30 (7th Cir. 2006), whether Ferguson is such a threat is disputed on this factual record, particularly with respect to whether Ferguson would be a direct threat with the proper accommodation, *see* 42 U.S.C. § 12111(3) (defining "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation").

As evidence of his fitness to return to work with the accommodation of a lower profile vehicle, Ferguson points to the multiple accommodation requests and medical notes he submitted after he was placed on leave. Ferguson began seeing Dr. Parvaiz in March 2013. Dr. Parvaiz evaluated Ferguson that month and determined that Ferguson could not perform repetitive operation of foot controls (which could include the foot pedals of a car) or climb stairs, stand more than ten minutes, and that he could walk only half a block and only do so with difficulty. Dr. Parvaiz also indicated that Ferguson had no work restriction in relationship to driving. That opinion was based solely on what Ferguson had told Dr. Parvaiz about his driving abilities. Dr. Parvaiz testified at his deposition that his March 2013 note was not offering an opinion on whether Ferguson was physically capable of performing his duties as a Watchman. Dr. Parvaiz drafted a second note in April 2013 stating that Ferguson was not completely recovered and could not resume work. On June 15, 2013, Dr. Parvaiz drafted a third note stating that Ferguson

was "released to full duty" and was able to resume his job, but had been "totally disabled and unable to work" for the period of March 12, 2013 to June 25, 2013.  Stmt. ¶ 47.  Dr. Parvaiz meant that he was releasing Ferguson to a "mostly sitting down" job, which was his understanding of the Watchman job based on Ferguson's representations.  *Id.*  Dr. Parvaiz did not mean that Ferguson did not need any kind of accommodation to do the job.[8]

Dr. Parvaiz also filled out a medical questionnaire, dated September 7, 2013, in response to Smith's direct request for additional information about Ferguson's limitations and requested accommodation.  Dr. Parvaiz indicated that Ferguson had weakness in his lower extremities and was permanently limited in repetitive use of foot controls, walking, standing, climbing stairs, and getting up after a fall.  Dr. Parvaiz recommended the accommodation of a sitting job for Ferguson.  In another medical questionnaire dated September 21, 2013, Dr. Parvaiz stated that Ferguson was permanently limited in the repetitive use of foot controls, meaning he should not spend any job hours in that activity.  He stated that Ferguson could only spend five percent of his work day standing, one to two percent of his work day walking, and five to ten percent of his work day driving.  In response to the question "What accommodations, if any, would allow [Ferguson] to do the essential functions of his job," Dr. Parvaiz answered, "To provide [Ferguson] a sitting job that he has been able to do since his employment."  Stmt. ¶ 56.

Dr. Parvaiz recommended a sitting job for Ferguson in September 2013.  The City argues that the request for sedentary-only duties is not a reasonable accommodation under the ADA.  Ferguson argues that assigning him to one of the other work sites where he had no driving or

_____

[8] A week later, on June 22, 2013, Dr. Parvaiz drafted another note, identical to the first except that it deleted that Ferguson had been under Dr. Parvaiz's care for "multiple complex medical problems" and described him as having been "disabled" rather than "totally disabled" since March 2013.  Stmt. ¶ 48.  Although this is included in the Statement of Facts, neither party makes any argument about why Dr. Parvaiz's opinion that Ferguson was "disabled" versus "totally disabled" has any bearing on the issues in this motion.

walking patrol duties would cost the City nothing. Ferguson also argues that there is a fact question as to whether the lower profile vehicle he requested is a reasonable accommodation or an undue burden. Ferguson states that his supervisors made this accommodation for him in 2012 when he was assigned to the 52nd and Oakley location—they allowed him to drive the mini-van—and the suggestion that he use the tree stump was a further accommodation.[9] He further argues that the accommodation of a lower profile vehicle is reasonable because the City has many such vehicles in its fleet.

A reasonable accommodation under the ADA may include making existing facilities more accessible and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). However, it is not a reasonable accommodation to "have another employee perform a position's essential function." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534–35 (7th Cir. 2013) ("The accommodation [plaintiff] seeks—another person to perform an essential function of the job she wants—is, as a matter of law, not reasonable[.]"). Similarly, the ADA does not require an employer to create a new position for a disabled employee. *Basith*, 241 F.3d at 929–30 (citing *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)). Ferguson must demonstrate that he is a qualified individual with or without a reasonable accommodation, then the City may argue that the accommodation would be an undue hardship. *See Majors*, 714 F.3d at 535 ("An ADA plaintiff can establish discrimination by showing the employer failed to accommodate the employee, but

---

[9] In Response, Ferguson also states: "At trial, there will be evidence that Ferguson requested a handrail to be installed on the wooden steps at one location. His bosses were kind enough to accommodate him. That request was oral and granted." Doc. 84, 10 n.6. It is the plaintiff's burden on summary judgment to marshal evidence in the record, not point the Court to evidence that is yet to come. *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to wheel out all its artillery to defeat it." (internal quotation marks omitted)). The Court disregards this unsubstantiated sentence.

she first must establish that she is a qualified individual with a disability. The defendant has the burden to prove that the accommodation would create an undue hardship on the business, but the plaintiff must first show that the accommodation she seeks is reasonable on its face." (alterations omitted) (citations omitted) (internal quotation marks omitted)).

Ferguson argues that because patrol constituted at most ten percent of his work duties, it is reasonable for the City to assign him to worksites without patrol duties. However, this request is not reasonable on its face because it would require other Watchmen to perform those patrol duties. *See Majors*, 714 F.3d at 534–35. The City also argues that, because Watchmen's locations vary daily based on employee availability and site priority, requiring the City to assign Ferguson only to certain sites would be an undue hardship. Ferguson has not put forward any evidence to dispute this argument, except that he was assigned to certain sites without patrol duties and his recollection of another Watchman who was disabled and assigned to sedentary duty. This is not enough to show that restructuring the position to only non-patrol sites is reasonable.[10]

Ferguson also argues that, with the accommodation of a lower profile vehicle, he would have been able to do his job when the request was denied in October 2013.[11] As discussed above, patrolling is an essential duty of the Watchman position. As of September 2013, Dr.

---

[10] Because the Court has found this requested accommodation to be unreasonable as a matter of law, it will not consider the City's undue burden argument. It does note, however, that the City's undue burden argument is not improper or untimely. A district court may allow an affirmative defense to proceed if the delay of its introduction did not cause the plaintiff any prejudice. *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436–37 (7th Cir. 2014). The City's undue hardship argument arose in response to Ferguson's September 2013 sedentary position request, after the City's August 2013 Answer. Ferguson was fully apprised of this defense in the City's correspondence, per this Court's standing order, on the motion for summary judgment. Ferguson has suffered no prejudice from this alleged delay. *See id.* at 437 (noting plaintiffs "had the opportunity to challenge this argument in their own summary judgment submissions").

[11] Ferguson also argues that the City should not be allowed to take advantage of his physical deterioration since October 2013 to deny his accommodation request. As discussed above, the Court examines the request and its appropriateness considering Ferguson's abilities at the time the request was made. *Nowak*, 142 F.3d at 1003.

Parvaiz stated that Ferguson could spend five to ten percent of his work day driving. Based on Ferguson's testimony, patrol at the 52nd and Oakley location was between six and ten percent of his total work hours. Therefore, Ferguson has presented some evidence that he could patrol by motor vehicle in October 2013. But the medical evidence from Dr. Parvaiz is somewhat confused. In the September 2013 medical questionnaire, Dr. Parvaiz also indicated that Ferguson was permanently limited in standing, walking, climbing stairs, getting up after a fall, and using repetitive foot controls. Also Dr. Parvaiz does not address the issue of the lower profile vehicle. There is therefore a question of fact as to whether Ferguson could perform the essential functions of the job in October 2013 with or without a reasonable accommodation.

The City does not directly address its undue hardship argument to the lower profile vehicle request. Rather it argues that because Ferguson cannot rise unassisted after a fall, another employee would be required to be "on call" in case of an emergency and that employee could become injured attempting to lift Ferguson. The City also argues that allowing Ferguson to return to vehicle patrol, considering his driving restrictions, would increase the risk of injury to himself and others and, because he works alone, the City would not know if he was driving more often than recommended by his doctors. Ferguson argues that the City has already made a similar accommodation because his supervisors allowed him to drive the mini-van in 2012 and the City already has these vehicles in its fleet, so this would not impose a financial burden on the City. Whether providing Ferguson a lower profile vehicle is an undue burden is a disputed fact question. Summary judgment on this issue of whether Ferguson is a qualified individual or whether his request for a lower profile vehicle is an undue burden is denied.

Finally, Ferguson also argues as an aside that on this record summary judgment should be entered for him on liability. This, however, would not be proper under the rules of procedure,

which require the Court to give notice and a reasonable time to respond when it is considering judgment independent of a motion. *See* Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; . . . . (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 602 (7th Cir. 2015) ("A motion for summary judgment is not an invitation to summarily resolve the case for *or* against the movant based on the paper record.").

Because there is a dispute as to whether Ferguson was qualified to perform motor vehicle patrol in October 2013 with the accommodation of a lower profile vehicle, and whether providing such a vehicle would have been an undue burden, summary judgment on this issue is denied.

### 2. Interactive Process

The City also argues that it sufficiently engaged in the interactive process with Ferguson to satisfy the ADA. "[T]he ADA may require an employer to reassign a disabled employee to a different position as a reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Gile*, 95 F.3d at 498. The ADA does not require an employer to "provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Id.* at 499.

Ferguson responds that Smith and Murphy did not sincerely participate in the interactive process. However, the undisputed record shows that Murphy sent multiple letters to Ferguson to clarify his medical status and requested accommodation. Smith, too, corresponded with Ferguson and called Dr. Parvaiz to clarify the same. After the City determined Ferguson was not fit for duty as a Watchman, it placed Ferguson into its job reassignment process. Ferguson

informed the City that he would not consider any job at a lower pay rate or seniority level, therefore only two vacancies matching that criteria appeared during the 92-day search period, and Ferguson was not qualified for either position.

That the City interacted with Ferguson to try to determine what accommodation he was requesting and to find him another suitable City job once he was found unfit for duty is not actually disputed on this record. Summary judgment on any duty to reassign claim is granted. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) (discussing ADA duty to reassign and engage in the interactive process).

## II. Discrimination Claim

The City also seeks dismissal of Ferguson's discrimination claim on the basis that he cannot show the City placed him on medical leave in October 2012 due to discriminatory motives. Ferguson does not directly address this argument, except to state that there are many fact issues for trial. Because Ferguson does not meet his burden to show a *prima facie* case of discrimination, summary judgment on this claim is granted.

An ADA plaintiff may establish discrimination with either direct evidence of his employer's "discriminatory animus" or through the indirect, burden-shifting method using circumstantial evidence to show the employer intentionally discriminated against him. *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000). Direct evidence "in and of itself suggests" that the employer took action because of the plaintiff's disability. *Id.* For the indirect method, the plaintiff uses circumstantial evidence to establish a *prima facie* case of discrimination. *Id.* at 672. Then the employer must articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* At that point the burden shifts back to the plaintiff to prove that this offered reason is pretext. *Id.* For either method, to survive summary judgment, the

plaintiff "must present sufficient evidence to allow a rational jury to conclude that, but for [the plaintiff's disability]," the employer would not have committed the adverse employment action. *Id.* at 670–71.

Neither party disputes that the alleged adverse action is the October 2012 medical leave of absence decision. *See Timmons*, 469 F.3d at 1128 (explaining that involuntary placement on disability leave was an adverse employment action). As for direct proof of discriminatory intent, Ferguson admits that Cross and Ferguson did not make any derogatory comments about his medical condition. The only potentially discriminatory comments in the record are from Clay and Mamie, the weekend Supervisors, and those individuals had no involvement with the decision to place Ferguson on medical leave. Ferguson does not present sufficient evidence to proceed under the direct method. *See Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 707 (7th Cir. 2015) (explaining the direct method may be proved by either a "smoking gun" or evidence including: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action").

Similarly, Ferguson has not made a *prima facie* case for discrimination under the indirect method. Ferguson must produce evidence to show that the City placed him on medical leave because of his disability "rather than some other job-related reason." *Timmons*, 469 F.3d at 1129. Of course, the City's placement of Ferguson on disability leave does not automatically trigger ADA liability. *Id.* at 1128 n.2 ("In a rather basic sense, an employee placed on *disability* leave has been placed in that status *because of* his disability, but this cannot be conclusive for

ADA purposes.").  The indirect method may be proved by evidence of similarly situated nondisabled persons who received more favorable treatment or other evidence from which a jury could infer discrimination.  *Id.* at 1129.  And the Seventh Circuit has clarified that "[u]nder the indirect method of proof, this analysis often overlaps the pretext analysis."  *Id.*

Ferguson has presented no evidence of similarly situated comparators, beyond a vague mention in his deposition of another Watchman who he claims was disabled and accommodated with a sedentary job.  Similarly, Ferguson has not presented any evidence from which a jury could infer that the City placed him on medical leave based on discriminatory animus against his muscular dystrophy, rather than the legitimate concerns about his physical fitness for duty, his own safety, and the safety of others.  The job-related rationale for the FFD examination and the decision to place Ferguson on medical leave is clear in the record and Ferguson has not pointed to any evidence of pretext.  *See id.* (affirming grant of summary judgment when undisputed evidence showed employer acted out of legitimate safety concerns).

Ferguson has not met his burden on summary judgment to show discrimination.  Summary judgment is therefore granted for the City on this claim.

## III.    Retaliation Claim

 The City also seeks summary judgment on Ferguson's retaliation claim on the basis that he has not shown a causal link between any protected activity and the October 2012 medical leave.  Ferguson does not address this argument at all in his responsive briefs.  His theory of retaliation in the Complaint is that the City placed him on medical leave in retaliation for his asking for a lower profile vehicle as an accommodation.

"The Act prohibits an employer from retaliating against an employee who has raised an ADA claim, whether or not that employee ultimately succeeds on the merits of that claim."

*Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). As with discrimination, retaliation may be proved by the direct or indirect method. *Id.*

Ferguson has presented no evidence that the decision to place him on medical leave was in retaliation for his asking for a lower profile vehicle. The evidence demonstrates that the decision to place him on medical leave was based on his FFD examination results, with the FFD examination being prompted by his fall and concerns about health and safety.

Similarly, Ferguson has not presented any evidence from which a rational trier of fact could infer that the City was retaliating against him by placing him on leave. Critically for this method, Ferguson does not point to any evidence that Murphy knew of Ferguson's vehicle requests. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668–69 (7th Cir. 2006) ("[P]roof of retaliation under the indirect method presupposes that the decision-maker knew that the plaintiff engaged in a statutorily protected activity, because if an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them." (citation omitted) (internal quotation marks omitted)). Even if Ferguson's vehicle requests to "Eli," Renda, Clay, and Mamie could permit the inference that the City knew of his complaints, he has not presented evidence "that a similarly situated employee who did not engage in statutorily protected activity was treated more favorably." *Id.* at 669.

Because Ferguson has not met his burden, the City's motion for summary judgment on his retaliation claim is granted.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment [80] is granted in part and denied in part. Summary judgment is granted on Ferguson's discrimination, retaliation,

and failure to reassign claims.  Summary judgment is denied as to Ferguson's failure to

accommodate claim.

Dated: October 13, 2015

_____
SARA L. ELLIS
United States District Judge